IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

ROBERT GARRETT and            )
SONYA GARRETT,                )
                              )
              Plaintiffs,     )
                              )        CIVIL ACTION NO.  1:10cv23WHA-TFM
v.                            )        (WO)
                              )
NELSON AND AFFILIATES, INC.,  )
                              )
              Defendant.      )

**MEMORANDUM OPINION AND ORDER**

**I.  INTRODUCTION**

This cause is before the court on a Motion for Summary Judgment filed by Defendant

Nelson and Affiliates, Inc. ("Nelson") (Doc. #80).  The Plaintiffs, Robert Garrett ("Garrett") and

Sonya Garrett (collectively, the "Garretts") filed an Amended Complaint (Doc. #5) in this case

against Nelson and several other defendants (the "Dismissed Defendants").[1]  The Amended

Complaint alleges that Nelson is liable to the Garretts on the basis of (1) negligence and

wantonness on the basis of Nelson's acts (Count Two); (2) negligence and wantonness on the

---

[1]The Dismissed Defendants have since been dismissed from this case, with prejudice.
Doc. #83.  Prior to being dismissed, the Dismissed Defendants had filed a third-party complaint
(Doc. #25) against Circle City Glass, Inc., seeking to have Circle City "indemnify, defend, and
hold harmless" the Dismissed Defendants.  Doc. #25 at 3-4.  Because the Dismissed Defendants
are no longer parties to this case, making the issue of indemnity and defense irrelevant, and
because the Garretts have not asserted an independent claim against Circle City, the court finds
that Circle City is due to be DISMISSED from this case as a third-party defendant.  *See, e.g.*,
*Hanko v. United States*, 583 F. Supp. 1280, 1284 (W.D. Pa. 1984) (dismissing third-party
defendant where "a finding of liability against the United States must precede a claim of
entitlement to indemnity or contribution from the third-party defendant," and such a finding of
liability was foreclosed when the United States was granted summary judgment).

basis of Nelson's acts combined with the acts of the Dismissed Defendants (Count Three);[2] and (3) loss of consortium (Count Five).  Nelson moved for summary judgment on each of the Counts against it.  For the reasons to be discussed, the Motion for Summary Judgment is due to be GRANTED IN PART AND DENIED IN PART.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial.  *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).  Acceptable materials under Rule 56(c)(1)(A) include

---

[2]The Garretts concede all of their wantonness claims in this case, and therefore, summary judgment is due to be GRANTED with respect to the wantonness claims in Count Three.  Neither party discusses the merits of the negligence claims in Count Three in their briefs, and therefore, the Motion for Summary Judgment is due to be DENIED with respect to those claims.

"depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, the evidence of the non-movant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## III. <u>FACTS</u>

The submissions of the parties establish the following facts, viewed in a light most favorable to the Garretts, the non-movants:

### A.   **Garrett's Employment with Circle City**

Garrett began working for Circle City Glass, Inc. ("Circle City") in 2006 as a Glazing Superintendent. At the time Circle City hired Garrett, Garrett had approximately two decades of experience working for a competitor. Garrett had done window installation work for many years prior to being hired by Circle City, and, as a result, had used scaffolding to complete his work in

the past.  Due to Garrett's prior experience, Circle City had Garrett train other Circle City employees on the use of scaffolds.

**B.      The Bainbridge Site**

In 2007, the Decatur County Board of Education contracted with JCI General Contractors, Inc. and All State Construction, Inc. (collectively, "JCI"), to build a high school in Bainbridge, Georgia.  JCI subsequently subcontracted with a number of different subcontractors.  Two of the subcontractors were Nelson and Circle City.  Nelson was responsible for installing and finishing interior sheetrock.  Circle City was responsible for installing exterior windows and doors.  Nelson and Circle City did not have a contractual relationship with each other.

All subcontractors signed a standard contract with JCI.  The standard contract made each subcontractor responsible for, *inter alia*, providing its own "labor, materials, equipment, and services, including . . . scaffolding."  Def.'s Ex. 2 ¶¶ 4.1, 9.1.  The standard contract also required subcontractors to perform work in a safe manner, and to designate a safety representative.  Def.'s Ex. 2 ¶¶ 6.3, 9.14.1, 9.14.5.  Circle City designated Garrett as its safety representative.

While the standard contract stated that subcontractors were responsible for providing their own equipment, in practice, they shared equipment with one another at times.  Specifically, Garrett and Daniel Plummer ("Plummer"), JCI's project superintendent, both testified that subcontractors shared equipment at the Bainbridge site.  Plummer Dep. 97:11 - 22; Garrett Dep. 24:5-10.  For example, Plummer stated that the terms of the standard contract making subcontractors responsible for bringing their own equipment were not "written in stone . . . . if

4

asked, most subcontractors will allow you to use something." Plummer Dep. 97:18-22. Garrett testified that "not only did we use other sub[contractors]' equipment, other sub[contractors] also used our equipment. . . . I recall specifically that employees of Nelson and Associates . . . used our equipment on this job from time to time." Garrett Aff. at 1.

Nelson brought its own scaffolding to the job site. Nelson's safety inspector, Jim Rytlewski ("Rytlewski"), testified that Nelson marked its scaffolding with blue, black, and silver paint. Rytlewski Aff ¶ 10.


**C.      The Accident**

On the morning of February 27, 2009, Garrett and his son-in-law, Andrew Kenny ("Kenny"), who also worked for Circle City, drove to the Bainbridge site together. After arriving at the job site, Garrett and Kenny went to work in separate buildings.

Garrett planned on caulking the windows in the gym. Prior to caulking windows that were approximately 16 feet off the ground, Garrett needed to examine the windows. To do so, he needed equipment that would help him reach the height of the windows.

Garrett walked into a large room adjacent to the gym, which many subcontractors had been using to store equipment. In this room, Garrett found a variety of equipment, including two scissor lift devices, and a Baker's Scaffold. Neither the scissor lifts nor the Baker's Scaffold were Circle City's equipment.

Garrett first intended to use the scissor lifts to raise himself to the windows, but he could not find a key that would allow him to operate the lifts. Instead, Garrett decided to use the Baker's Scaffold. A Baker's Scaffold is a scaffold system with narrow dimensions, and is

portable because it has wheels.  A Baker's Scaffold can be used as a single unit or can be stacked

to allow a worker to reach greater heights.  Garrett knew that Circle City had scaffolding at the

Bainbridge site, but he did not use it because it was stored in a different area of the job site.

The Baker's Scaffold was stacked two sections high, it measured approximately twelve

feet in height, and rolled using four wheels that could be individually locked in place.  The

Baker's Scaffold appeared to be yellow in color, though Kenny noted that it "was old and

scratched," (Kenny Dep. 39:9-11) and Garrett explained that it was "covered with stains and

smears of sheet rocking material" (Garrett Aff. at 1).  The Baker's Scaffold contained no

markings to identify its owner.

Garrett moved the Baker's Scaffold to the windows he wanted to examine.  Garrett

locked down the wheel brakes, and then physically tried to move it to ensure that the locks

would hold, though he admitted that he did not individually inspect each wheel lock.  Garrett

Dep. 35:22 - 36:3; 44:8 - 45:3.

Garrett did not have a spotter while he used the Baker's Scaffold.  He did not bolt it to

the building to secure it, but he stated that bolting it to the building was not appropriate because

he did not want to damage the gym's finished walls.  Garrett noted that the Baker's Scaffold

lacked certain safety features, such as a handrail and a "toe board," though he noted he had not

seen toe boards on scaffolds "on that job."  Garrett Dep. 40:2-15.  Garrett also chose not to use a

"full body harness with lanyard and fall arrest system," though Plummer said that using such a

system was necessary only if "the scaffolding is not stable."  Plummer Dep. 81:22 - 82:12.

Garrett reached the top of the Baker's Scaffold and turned to examine the window. Within 30 seconds, and without warning, the Baker's Scaffold fell.  Garrett suffered a fractured vertebra in his back, as well as a broken leg.

**D.     Plummer and Kenny Arrive at the Accident Scene**

Kenny was the first to arrive at the accident scene.  Kenny initially was not sure why the accident occurred beyond loss of balance.  However, Kenny subsequently examined the Baker's Scaffold and determined that one of its wheel locks was not working.  Kenny explained that if the wheel locks are not working, a Baker's Scaffold becomes "very rickety."  Kenny Dep. 21:19-23.  Kenny also noted that part of the Baker's Scaffold was bent as a result of the fall.  Kenny Dep. at 23:3-11.

Plummer arrived at the accident scene shortly after Kenny.  He stated that he examined the Baker's Scaffold and thought that the wheel locks were functioning, though he has not testified regarding the fact that Kenny thought one of the wheel locks was broken.  Plummer Dep. 62:20 - 63:7.  Plummer also noted that part of the Baker's Scaffold was bent.

Kenny considered taking pictures of the Baker's Scaffold and the accident scene, but he did not because Plummer discouraged him from doing so, telling Kenny that he would take care of it.  There are no pictures of the Baker's Scaffold, and Plummer has admitted that he did not take any pictures.  Plummer Dep. 66:3-5.

Immediately after suffering his injuries, Garrett told Plummer that "he'd done something stupid," and that the accident was his fault.  Plummer Dep. 40:12-19.  However, in his

deposition, Garrett testified that he did not know what happened at the time of the accident, or who was at fault.  *See, e.g.*, Garrett Dep. 43:1-18.

**E.     The Baker's Scaffold Disappears**

Approximately a week after the accident, Kenny returned to the accident scene, yet he could not find the Baker's Scaffold.  He found what he thought was a single piece of the Baker's Scaffold, but he was not sure.  No one has been able to locate the Baker's Scaffold since the date of the accident.

Plummer thought that the Baker's Scaffold was Nelson's property, and he thought that Nelson removed the scaffold from the job site.  Plummer testified that he saw Mike Bostic ("Bostic"), a supervisor for the Nelson crew, carrying the Baker's Scaffold away from the scene after the accident.  Plummer Dep. 69:5-15.  Additionally, Plummer had previously seen Nelson using the very same Baker's Scaffold prior to the date of the accident.  Plummer Dep. 66:22 - 67:20.

Nelson, on the other hand, claims that the Baker's Scaffold was not its property. Rytlewski testified in an affidavit that Nelson had completed all of its work at the Bainbridge site two weeks prior to the accident, and had removed its scaffolding.  Rytlewski Aff. ¶ 9.  Rytlewski stated that Nelson's payroll records show that Nelson had no employees on the job site from February 20, 2009 through March 31, 2009.  Bostic testified that all of Nelson's scaffolding was removed "most likely before" February 2009, but he was not sure whether it could have been removed at some point in February.  Bostic Dep. 9:20 - 10:13.

## IV.  DISCUSSION[3]

Nelson argues that it is due summary judgment on the negligence, wantonness, and loss of consortium claims.  The Garretts concede that summary judgment is due to be granted with respect to their wantonness claims, but oppose Nelson's Motion with respect to their claims for negligence and loss of consortium.  The court concludes that summary judgment is due to be granted with respect to the wantonness claims, but denied with respect to the claims for negligence and loss of consortium.

### A.      Negligence and Contributory Negligence

The Garretts asserts that Nelson was negligent because it allowed other subcontractors to use the Baker's Scaffold, despite the fact that it was unsafe for reasonable use, and as a result, Garrett was injured while using it.

To establish a claim for negligence under Alabama law, a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff; (2) a breach of the standard of care applicable to that duty; (3) causation; and (4) damage.  *Hilliard v. Huntsville Elec. Util. Bd.*, 599 So. 2d 1108, 1110 (Ala. 1992).  Even if a plaintiff can satisfy these elements, a defendant can avoid liability for its negligence through the affirmative defense of contributory negligence.  *Phillips v. Seward*, 51 So. 3d 1019, 1025 (Ala. 2010).

---

[3]Both parties' briefs apply Alabama law.  Therefore, this court will also apply Alabama law.  *See Bush v. Teachers Ins. & Annuity Ass'n of Am.*, No. 1:05cv378-VPM, 2006 WL 3075539, at *2 n.4 (M.D. Ala. Oct. 30, 2006) (McPherson, Mag. J.) ("[W]here a potential argument exists for the application of a foreign state's law, the parties' failure to make such an argument or comply with rule 44.1 allows the court to apply the law that the parties assume to be controlling.") (citing *Liberty Mut. Ins. Co. v. Wheelwright Trucking Co., Inc.*, 851 So.2d 466, 475 (Ala. 2002)).

Nelson makes a variety of arguments as to why it is due summary judgment on the Garretts' negligence claims.  Nelson argues that (1) it did not owe a duty of care to Garrett; (2) even if it owed a duty of care to Garrett, it did not breach such a duty; and (3) Garrett was contributorily negligent.  The court rejects each of these arguments.

1.      *Duty*

Nelson argues that it did not owe Garrett a duty of care for two reasons.  The court concludes that issues of fact exist with respect to each of these reasons.

        i.  There Are Issues of Fact as to Whether Nelson Owned the Baker's Scaffold

First, Nelson argues that it did not owe a duty to Garrett because it did not own the Baker's Scaffold.  Nelson cites to several sources of evidence to support its argument.  First, Nelson asserts that, according to the testimony of Rytlewski and Bostic, Nelson removed all of its scaffolding from the gym before the date of the accident.  Rytlewski Aff. ¶ 9; Bostic Dep. 35:14-23.  Second, Nelson asserts that all of its scaffolds at the Bainbridge site were marked with blue and gray paint (Rytlewski Aff. ¶ 7; Bostic Dep. 33:6 - 34:3), yet Garrett and Kenny testified that the Baker's Scaffold was entirely yellow, and contained no other markings (Garret Dep. 115:15-23; Kenny Dep. 38:20 - 39:11).

Some evidence contradicts Nelson's argument or raises questions about the cited evidence.  First, Plummer testified that Bostic, a member of the Nelson crew, carried the Baker's Scaffold at issue away after the accident.  Plummer Dep. 69:5-15.  Second, Plummer testified that he had seen Nelson employees using the Baker's Scaffold at issue, and also noted that it was

10

covered with dry wall dust and cement.  Plummer Dep. 66:22 - 67:20.  Plummer thus concluded that "to the best of my knowledge, the scaffold belonged to Nelson and Associates," though he conceded that he was not 100% certain.  Plummer Dep. 72:13-14, 100:10-14.  Garrett even testified that he "specifically remembered Nelson and Associates personnel using scaffolding in their work that was yellow."  Garrett Aff. at 1.  Additionally, Bostic noted that when Nelson receives new Baker's Scaffolds from the factory, they are painted yellow, (Bostic Dep. 23:3-5), so a "brand new" scaffold would not have been painted blue, gray, and black (Bostic Dep. 33:9-11).

Additionally, there is no conclusive evidence of what the Baker's Scaffold actually looked like in this case.  While both Kenny and Garrett testified that it was a yellow scaffold, Kenny noted that the Scaffold "was old and scratched," (Kenny Dep. 39:9-11) and Garrett explained that it was "covered with stains and smears of sheet rocking material" (Garrett Aff. at 1).  Additionally, no one took pictures of the Baker's Scaffold after the accident to document its condition.  In fact, when Kenny asked Plummer if pictures needed to be taken, Plummer discouraged Kenny from taking pictures, and said that "he [would] take care of that."  Kenny Dep 20:9-19.  Additionally, because the Baker's Scaffold has been missing since shortly after the accident, neither party has been able to confirm its color or characteristics.

At the summary judgment stage, the court must read the evidence in the light most favorable to the Garretts, the non-movants.  In this case, because the Baker's Scaffold is missing, and there are no pictures of it, the only evidence the court has before it is contradictory testimony of multiple parties.  In other words, the issue of ownership in this case turns on whether the jury believes Nelson's witnesses or the Garretts' witness.  A reasonable juror could disbelieve

11

Rytlewski and Bostic, and thus find that Nelson owned the Baker's Scaffold. Thus, there is an issue of fact as to whether Nelson owned the Baker's Scaffold.

> ii.   Nelson Owed a Duty Because it Shared Equipment, thus Creating a Bailment

Nelson argues that, even if it owned the Baker's Scaffold, it did not owe a duty to Garrett. Nelson states that it could not find any cases in which a subcontractor's employee sued a fellow subcontractor, not in privity of contract, for injuries suffered by the employee on a job site. Nelson contends, however, that "as a general rule, outside parties such as a premises owner or general contractor do not owe a duty of care to employees of an independent contractor with respect to working conditions arising during the progress of the work on the contract," but rather, owe a duty "only in the event they retained or reserved the right to control the manner in which the subcontractor's employee performed the work so that their relationship converted to that of master and servant." Def.'s Br. in Supp. at 20 (citing *Thomas v. Pepper S. Constr., Inc.*, 585 So. 2d 882, 884 (Ala. 1991)).

Nelson's statement of the law is not comprehensive (as is suggested by the words "as a *general* rule") with respect to the facts of this case, because an outside party can be liable to a subcontractor's employees for reasons besides entering into a master-servant relationship.

Instead of seeking to hold Nelson liable due to a master-servant relationship, the Garretts assert that the basis under which Nelson owed Garrett a duty is that Nelson allowed other subcontractors to use the Baker's Scaffold, despite the fact that it was unsafe for reasonable use, and while using the Baker's Scaffold, Garrett was injured. The proper way to analyze such an argument under Alabama law is under the law of bailments.

"A bailment is defined as the delivery of personal property by one person to another for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed, and the property returned or duly accounted for when the special purpose is accomplished, or kept until the bailor reclaims it." *Ziva Jewelry, Inc. v. Car Wash Headquarters, Inc.*, 897 So. 2d 1011, 1014 (Ala. 2004) (quoting *S/M Indus., Inc. v. Hapag-Lloyd A.G.*, 586 So.2d 876, 881-82 (Ala. 1991)). For a bailment to exist, the bailee must voluntarily assume custody and possession of the property, and must intend to exercise control over it. *Farmer v. Mach. Craft, Inc.*, 406 So. 2d 981, 982 (Ala. Civ. App. 1981) (citations omitted). A bailment can be created either by an actual or constructive change in possession, and a constructive change in possession can "grow[] out of the relation of the parties." *Ridgely Operating Co. v. White*, 150 So. 693, 695 (Ala. 1933).

If a bailment exists, the bailor owes certain duties to the bailee, depending on the type of bailment. *See Penton v. Favors*, 78 So. 2d 278, 281 (Ala. 1955) . For example, if the bailment in this case was solely for the benefit of the bailee (Garrett), then the bailor (Nelson) owed to the bailee a duty to "'giv[e] warning or notice of those defects in the [bailed chattel], if any, of which he has knowledge and which in reasonable probability will imperil those using it.'" *Id.* (citation omitted). In other words, if the bailor knows of a defect in the bailed chattel, and knows the defect will likely injure the bailee when the bailee is using the bailed chattel, then the bailor has a duty to tell the bailee about the defect. If the bailment is for mutual benefit, then the bailor owes to the bailee the additional duty to undertake a reasonable inspection of the bailed chattel, and is "responsible for resulting injuries where he could have discovered the defective condition of the [bailed chattel] by the exercise of reasonable care." *Id.*

13

Alabama courts have found bailments to exist when a bailee borrowed equipment from a bailor.  For example, in *Goar*, the Alabama Supreme Court found that a bailment existed when a bailee borrowed a cattle trailer from a bailor to transport livestock to auction.  *Econ. Fire & Cas. Co. v. Goar*, 551 So. 2d 957, 957-58 (Ala. 1989).  Similarly, in *Penton*, the Alabama Supreme Court found a bailment existed when a prospective purchaser borrowed a car from a car dealership.  *Penton*, 78 So. 2d at 281.  While no Alabama case has addressed the issue of whether subcontractors or contractors loaning equipment to one another constitutes a bailment, numerous out-of-state courts have concluded that such a loan constitutes a bailment.  *See, e.g.*, *Kennedy v. U.S. Const. Co.*, 545 F.2d 81, 84 (8th Cir. 1976) (finding a bailment exists when "one subcontractor on a job . . . lend[s] tools or equipment to another subcontractor with knowledge that the tools or equipment will be used by employees of the latter"); *Ridenhour v. Colson Caster Corp.*, 687 S.W.2d 938, 941 (Mo. Ct. App. 1985) (finding "substantial out-of-state authority" that a bailment exists when a subcontractor loans equipment to another subcontractor's employee); *see also* Norman O. Harlow, J.D., *Duty and Liability of Subcontractor to Employee of Another Contractor Using Equipment or Apparatus of Former*, 55 A.L.R. 4th 725 (2011) (discussing statutory and common law bases for holding subcontractors liable for injuries to other contractor's employees who borrow their equipment); *Olivier v. Snowden*, 426 S.W.2d 545, 548 (Tex. 1968) (same, but using language of licensee and invitee);[4] *cf.* 13 Am. Jur. 2d

_____

[4]Courts from some jurisdictions phrase the question at issue here by using the words "licensee" and "invitee," words that Alabama courts use to discuss premises liability, while other courts use the language of bailments.  *See* Harlow, *supra*.  Regardless of whether this court uses the language of premises liability or bailments, the underlying legal standard as applied to these facts appears to be the same.  *See, e.g.*, *Hill v. Lyons Plumbing & Heating Co.*, 457 S.W.2d 503, 504 (Ky. 1970) ("The duty of a gratuitous bailor of personal property is analogous to the duty of a licensor toward a licensee, which is to disclose the existence of any known defects that may

Building, Etc. Contracts § 140 (stating that a duty of care exists "[w]hen it is a common practice for the employees of separate contractors . . . to make mutual use of each other's facilities . . . and a contractor supplying equipment has reasonable cause to know . . . .").

The court concludes that, under Alabama law, and the evidence before the court, a reasonable jury could conclude that a bailment existed in this case, due to the sharing that occurred between subcontractors, including Nelson. Nelson protests this point. Nelson notes that all subcontractors at the Bainbridge site agreed to a standard contract, which made them responsible for providing their own equipment. Ex. 1 to Rytlewski Aff. at ¶¶ 4.1, 9.1. Rytlewski stated that Garrett never asked permission to use Nelson's scaffolding, nor did Nelson loan its equipment to Circle City or Garrett, nor did Nelson share equipment with Circle City.

On the other hand, Garrett and Plummer both stated that subcontractors shared equipment at the Bainbridge site. Plummer Dep. 97:11 - 22; Garrett Dep. 24:5-10. For example, Plummer stated that the terms of the standard contract making subcontractors responsible for bringing their own equipment were not "written in stone . . . . if asked, most subcontractors will allow you to use something." Plummer Dep. 97:18-22. Garrett testified that "not only did we use other sub[contractors]' equipment, other sub[contractors] also used our equipment. . . . I recall specifically that employees of Nelson and Associates . . . used our equipment on this job from time to time." Garrett Aff. at 1.

---

endanger him in the use of the property."); *see also* Harlow, *supra*.

    For purposes of clarity, this court concludes that, with respect to Alabama law, the question in this case should be addressed using the language of bailments, not premises liability. In Alabama, a bailment refers only to a chattel, which is *personal*, not real, property. *Ziva Jewelry*, 897 So. 2d at 1015 (referring to a bailment as "the delivery of *personal* property") (emphasis added) (citations omitted). Premises liability generally refers to *real*, not personal, property. *Christian v. Kenneth Chandler Constr. Co.*, 658 So.2d 408, 410 (Ala. 1995).

Thus, the issue of whether Nelson shared its equipment involves contradictory testimony. Moreover, the court concludes that a reasonable juror could disbelieve Rytlewski. Thus, reading the facts in a light most favorable to the Garretts, the non-movants: subcontractors on the Bainbridge high school project, including Nelson, had a practice and implied understanding of lending equipment, including scaffolding, to one another; the purpose of lending the property was for the convenience of each subcontractor and its employees; Garrett voluntarily assumed custody and possession of the Baker's Scaffold when he borrowed it; and a bailment existed at the time that Garrett was injured.

A reasonable juror could further conclude that the bailment was for mutual benefit. Reading the evidence in the light most favorable to the Garretts, the non-movants, Nelson engaged in an equipment interchange with other subcontractors at the Bainbridge site. By doing so, Nelson gained the benefit of having access to other subcontractors' equipment, and in exchange, it gave other subcontractors' employees access to its equipment. *See Kennedy*, 545 F.2d at 84 (suggesting a bailment for mutual benefit existed in these circumstances); 13 Am. Jur. 2d Building, Etc. Contracts § 140.

Therefore, because a bailment for mutual benefit existed, Nelson owed a duty to Garrett. Accordingly, summary judgment is not due to be granted on the ground that Nelson owed no such duty.

2.      *Breach*

Nelson argues that it did not breach any duty of care that it owed to Garrett. In Alabama, in the context of a bailment for mutual benefit, a bailor owes to a bailee a duty to undertake a

reasonable inspection of the bailed chattel, and is "responsible for resulting injuries where he could have discovered the defective condition of the [bailed chattel] by the exercise of reasonable care." *Penton*, 78 So. 2d at 281.

In support of Nelson's argument, Rytlewski testified that "[a]ll of the scaffolds Nelson brought to the job site were in good working order, without any defects, and included all necessary components. [Nelson] used the scaffolding on an almost daily basis without any accidents or issues." Rytlewski Aff. ¶ 6.

The Garretts respond by noting that, immediately after the accident, Kenny examined the Baker's Scaffold, and found that one of the wheel locks was defective. Kenny further noted that part of the Baker's Scaffold was bent. The Garretts also complain that they never had an opportunity to examine the Baker's Scaffold, because shortly after the accident, it disappeared, and still has not been located. Moreover, there are no photographs of the Baker's Scaffold, as discussed above.[5]

Nelson responds that the Garretts have no proof of a defect in the Baker's Scaffold, and that they cannot prove whether the defect in the wheel existed before the fall or was created as a result of the fall. Moreover, Nelson notes that Plummer examined the Baker's Scaffold after the accident, and did not find anything wrong with it, including the wheel locks. Plummer Dep. 62:16 - 63:12.

The court concludes that an issue of fact exists with respect to Nelson's alleged negligence. While Rytlewski and Plummer testified that there was no defect in the Baker's

---

[5]Garrett also raises the issue of spoliation of the evidence. Because the court has concluded that summary judgment is due to be denied on the basis of other arguments, the court need not address Garrett's spoliation arguments.

Scaffold, a reasonable juror could disbelieve this testimony based on Kenny's deposition, coupled with the uncertainty created by the absence of photographs and the fact that the Baker's Scaffold disappeared after the accident.  Thus, summary judgment will not be granted on this ground.

3. *Contributory Negligence*

Nelson argues that, even if it were negligent, it is not liable to the Garretts as a matter of law because Garrett was contributorily negligent in using the Baker's Scaffold.  The court rejects this argument.

Contributory negligence is established if a plaintiff has (1) knowledge of the condition, (2) appreciation of the danger, and (3) fails to exercise reasonable care with such knowledge and appreciation of the danger.  *See Wallace v. Ala. Power Co.*, 497 So. 2d 450, 457 (Ala. 1986). The Alabama Supreme Court has noted that, to satisfy the contributory negligence defense, a defendant need only show "that the [plaintiff] knew or should have known of the general risk involved."  *Id.*  However, the "question of the existence of contributory negligence is normally one for the jury."  *Wyser v. Ray Sumlin Constr. Co.*, 680 So. 2d 235, 238 (Ala. 1996); *see also Lewis v. Sears, Roebuck & Co.*, 512 So. 2d 712, 713 (Ala. 1987) ("Unless the evidence bearing upon [contributory negligence] is entirely free of doubt and adverse inference, this question must be submitted to [a trier of fact].").

The court assumes, for the sake of argument, that Garrett knew of the condition and appreciated the danger.  However, the court finds that a reasonable juror could find that Garrett acted with reasonable care.

18

The parties agree that Garrett, upon moving the Baker's Scaffold into place, physically tested it to ensure it would not move, and when it did not move, he climbed up it.  Nelson noted that Garrett (1) failed to use fall protection equipment, a spotter, or other safety measures while working on the Baker's Scaffold, despite using it on other occasions; (2) chose to use the Baker's Scaffold over other potentially safer alternatives, such as a scissor lift or a different style scaffold; and (3) used the Baker's Scaffold despite the fact that it lacked "various safety components," such as a handrail or toe board.  While Garrett may not have behaved in the safest manner possible, Garrett must only act with "reasonable care" to prevent a successful contributory negligence defense.  A reasonable juror could find that the above facts, without more, show that Garrett acted with reasonable care.

Nelson also claims that Circle City had a policy regarding employee use of scaffolds. The only evidence of this policy is Garrett's testimony that Circle City told employees to use their best judgment to make sure that everything is safe on a scaffold, ensuring that the wheels are locked and the scaffold is safe and "not falling apart," prior to using the scaffold.  Garrett Dep. 113:10-22.  The Alabama Supreme Court encountered a similar issue in *Tenn. Coal, Iron & R.R. Co. v. Spicer*, 89 So. 293 (Ala. 1921).  In that case, the plaintiff was injured on a scaffold that contained a faulty piece of timber, and the plaintiff was not aware of the fault prior to the time that he was injured.  *Id.* at 295.  The plaintiff's employer's policy stated that employees were "forbidden to enter upon any scaffold until he has satisfied himself by such personal examination that it is safe."  *Id.* at 296.  The Alabama Supreme Court noted that the employer's rule did not "define the measure or extent of the personal examination required, [and] could not be interpreted as imposing upon the duty of assuring his own safety."  *Id.*  Based on this

statement and testimony regarding the interpretation of that rule, the court concluded that a general overlooking of the scaffold was sufficient to avoid contributory negligence, and that the plaintiff had presented a jury question on this point.  *Id.*

The "policy" at issue in this case requires, at best, a similar general examination.[6]

Nelson claims that Garrett did not check all of the wheel locks prior to using the Baker's Scaffold.  However, Garrett claims that he locked all of the wheels, and tested the Baker's Scaffold by trying to physically move it to ensure it was steady, despite not examining each individual wheel lock.  A reasonable juror could find that such an examination constituted reasonable care.

Thus, the Garretts presented evidence from which a reasonable juror could conclude Garrett gave a general examination of the Baker's Scaffold prior to using it, and through this examination, he concluded that it was safe.  Due to this evidence, a jury question exists as to whether Garrett acted reasonably, and therefore, summary judgment is not due to be granted on the basis of contributory negligence.

4.    *Conclusion*

In sum, questions of fact exist with respect to duty, breach, and contributory negligence. Additionally, Nelson does not argue that it is due summary judgment on the issue of negligence

---

[6]The court does not imply that compliance with or violation a policy is necessarily determinative of the question of contributory negligence.  Nor does the court imply that the type of examination undertaken by Garrett in this case would or would not constitute contributory negligence, as a matter of law, under different facts.

for any other reason.  Accordingly, summary judgment is due to be DENIED with respect to the Garretts' negligence claims.

**B.      Loss of Consortium**

Nelson's only argument for why it is due summary judgment with respect to the Garretts' loss of consortium claim is that this claim is derivative of their negligence claim.  As the Motion for Summary Judgment is due to be denied with respect to the negligence claim, it follows that the Motion is similarly due to be DENIED with respect to the loss of consortium claim.

**V.  CONCLUSION**

For the foregoing reasons, it is hereby ORDERED as follows:

1.      The Motion for Summary Judgment (Doc. #80) is GRANTED IN PART AND DENIED IN PART.

2.      Summary Judgment is GRANTED with respect to Plaintiffs' Wantonness Claims against Defendant Nelson, which are contained within Counts Two and Three.

3.      Summary Judgment is DENIED with respect to Plaintiffs' Negligence Claims against Defendant Nelson, which are contained within Counts Two and Three, and Plaintiffs' Loss of Consortium Claim against Nelson (Count 5), and this case will proceed to trial on those claims.

4.      Circle City Glass, Inc. is DISMISSED from this case as a third-party defendant.

Done this 29th day of June, 2011.

/s/ W. Harold Albritton
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE